UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

|  |  |
|---|---|
| L.P.,[1]<br>*by and through her father, J.P.,*<br>*individually and on behalf of all others*<br>*similarly situated*,<br><br>      Plaintiff,<br><br>v.<br><br>BCBSM, Inc.,<br>*d/b/a Blue Cross and Blue Shield*<br>*of Minnesota*,<br><br>      Defendant and Counterclaimant,<br><br>v.<br><br>J.P.<br><br>      Counter Defendant | NO. 18-cv-1241 (MJD/DTS)<br><br><br><br><br><br>**REPORT AND RECOMMENDATION** |

---

Jordan M. Lewis, Jordan Lewis P.A., 4473 N.E. Eleventh Avenue, Fort Lauderdale, Florida 33334; David W. Asp and Jennifer Jacobs, Lockridge Grindal Nauen PLLP, 100 Washington Avenue South, Suite 2200, Minneapolis, Minnesota 55401, for Plaintiff L.P.

Joel Allan Mintzer, Blue Cross and Blue Shield of Minnesota, P.O. Box 64560, St. Paul, Minnesota 55164, for Defendant and Counterclaimant.

David W. Asp and Jennifer Jacobs, Lockridge Grindal Nauen PLLP, 100 Washington Avenue South, Suite 2200, Minneapolis, Minnesota 55401, for Counter Defendant J.P.

---

[1] Because Plaintiff was a minor at all relevant times and because her claims require the disclosure of confidential medical information, the parties agreed to use initials for both Plaintiff and her father, who is also the Counter Defendant. Stipulation to Allow Pl. to Proceed Using Initials, Dkt. No. 25.

**INTRODUCTION**

Plaintiff L.P. attended a state-licensed residential youth treatment facility in Missouri for approximately 17 months. She alleges her health care plan administrator, Defendant BCBSM, Inc., violated federal law by declining to pay the lion's share of benefits claims she submitted during that stay. Specifically, L.P. argues BCBSM's denial of coverage contravenes the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, which forbids ERISA-covered health care plans from imposing more stringent limitations on any offered mental health benefits than on comparable medical or surgical benefits. For its part, BCBSM contends the facility in question simply does not satisfy the health care plan's requirements for coverage at a residential treatment center, requirements it imposes equally on skilled nursing facilities. BCBSM asserts a declaratory counterclaim against L.P.'s father, J.P., regarding its right to recoup certain payments it claims it erroneously paid. The parties now seek summary judgment in their respective favor.

This is not a run-of-the-mill ERISA action. The authority addressing Parity Act claims is limited and provides precious few guideposts for this Court to follow. Different procedural postures and distinct plan language put no case on all fours with the present matter. Still, the Parity Act itself is clear: an insurance plan that covers a mental health treatment cannot impose more restrictive limitations on coverage, either by the express terms of the plan or by application of those terms, than it does upon a comparable medical treatment. BCBSM's plan violates that mandate by denying coverage for facility fees at a residential treatment center that provides more than incidental educational services, despite covering the same fees at a skilled nursing facility. BCBSM improperly denied at

least some of L.P.'s benefits claims as a result. Remand is necessary to determine both the benefits to which L.P. is entitled and to further develop the record as to whether a physician oversaw L.P.'s treatment.[2]

**FINDINGS OF FACT**

## I.   L.P.'s Stay at Change Academy

L.P. is a young woman who has struggled with mental health issues, including depression, suicidal ideation, self-harm, and reactive attachment disorder. Decl. of J.P. ¶ 3, Dkt. No. 55; Decl. of Joel A. Mintzer Ex. A, at AR1290, Dkt. No. 47.[3]  L.P. has tried a number of treatments in an effort to combat these issues, including counseling and hospitalization. *Id.* Unfortunately, each of these treatments was unsuccessful. J.P. Decl. ¶ 3. Searching for a way to help their daughter, L.P.'s parents enrolled her at Change Academy at Lake of the Ozarks, Inc., which she attended from June 2016 to early November 2017. *Id.* at ¶¶ 3, 5.  During L.P.'s stay, Change Academy was licensed by the state of Missouri, first as a "residential facility" and then as a "residential treatment agency for children and youth." AR0889-90.

Change Academy's program is comprehensive in nature and attempts to create a structured environment for school-age children. AR 2606. L.P.'s treatment plan included weekly group and individual therapy sessions. AR1702. She took part in a weekly psycho-educational group, multi-modal therapy, and frequently participated in recreational and

---

[2] This case is a candidate for a judicially-mediated settlement. An Order for Settlement Conference is issued contemporaneously with this Report and Recommendation.

[3] Unless otherwise noted, any further citation to the Administrative Record shall be denoted as "AR" and refer to the portions of that record attached as Exhibits A and B to Mr. Mintzer's declaration.

canine therapies. AR1702, AR2606-07. As part of her extended stay in the residential program, L.P. also completed coursework in Change Academy's high school curriculum. *E.g.*, AR1290, AR2612.

## II.    The Benefit Denials and Administrative Appeal

During her time at Change Academy, L.P. received health insurance benefits under a Plan sponsored by J.P.'s employer, which self-insures but delegates claims administration to BCBSM. AR0015. The Plan expressly covers mental health treatment at residential facilities, but provides qualifications a residential facility must satisfy. AR0110. Further, the Plan does not cover certain services it deems primarily educational or recreational in nature.[4] AR0042-43, AR0062-63.

Because Change Academy does not contract with a Blue Cross Blue Shield affiliate, J.P. paid Change Academy directly and then sought reimbursement from BCBSM. J.P. Decl. ¶¶ 6-7; AR0018. J.P. spent $189,477.74 paying charges from Change Academy. J.P. Decl. ¶ 7. Of that amount, BCBSM reimbursed a total of $83,554.55. J.P. Decl. ¶¶ 8-10; AR0810-37. Change Academy submitted most of its bills as facility claims for residence charges, but also submitted some claims for outpatient therapy. *E.g.*, AR0342-46, AR0402-11, AR1227-40. BCBSM initially paid J.P. for some of the facility charges. However, it began denying the facility claims as excluded from coverage under the Plan. AR0609. BCBSM also reprocessed the facility claims it had previously approved and adjusted them to deny any coverage. *E.g.*, AR0629-38. It then requested J.P.

---

[4] The Administrative Record includes both the 2016 and 2017 summary plan descriptions. There are no substantive differences between the relevant portions of the two documents.

reimburse it for the payments it had made on the now-uncovered claims. AR0878, AR0895-97.

J.P. appealed the denial of many of the claims. AR0874-902. In his appeal, J.P. stated confusion about the specific basis for denial of the claims. AR0879. BCBSM upheld the denial of the facility charges and provided J.P. a letter with the following rationale:

> The above-mentioned claims were denied because coverage for recreational services as part of a treatment program is excluded from the Plan benefits.
>
> ***
>
> According to your Plan documentation, a qualified residential behavioral health treatment facility is defined as follows: A facility licensed under state law in the state in which it is located that provides treatment by or under the direction of a doctor of medicine (M.D.) or osteopathy (D.O.) for mental health disorders, alcoholism, substance abuse or substance addiction. The facility provides continuous, 24-hour supervision by a skilled staff who are directly supervised by health care professionals. Skilled nursing and medical care are available each day. A residential behavioral health treatment facility does not, **_other than incidentally_**, provide educational or recreational services as part of its treatment program.
>
> ***
>
> The physician reviewer determined that there is no evidence that the treatment is by or under the direction of a physician. The treatment appears to provide substantial recreational services. It appears the charges are being submitted under an all-inclusive room and board code (1001) which identifies the services as hospital-based. The facility does not appear to be hospital-based.
>
> Therefore, these services are excluded by the Plan Document.

AR1212-13 (emphasis supplied). J.P. elected not to take a voluntary second appeal of this decision. In a separate letter, BCBSM agreed to reprocess four previously-denied claims that were submitted as outpatient office visits. AR1223-24.

Following the appeal, J.P. received two explanation of benefits forms from BCBSM. The first was for services L.P. received after she left Change Academy. J.P.

Decl. Ex. B. Although BCBSM approved $550.00 in benefits, it offset $440.00, explaining the "[p]ayment has been reduced and applied to the refund requested from you by us." *Id.* The second form, regarding services J.P.'s wife received, similarly approved benefits but reduced the payment and applied it "to the refund requested from you by [BCBSM]." *Id.* at Ex. C.

## III.    The Relevant Plan Language

In both 2016 and 2017, the Plan explicitly covered "behavioral health mental health care" at an "inpatient residential behavioral health treatment facility," including "all eligible inpatient services[.]" AR0042. The notes to the coverage information further explain that "[c]overage provided for treatment of emotionally disabled children in a licensed residential behavioral health treatment facility is covered the same as any other inpatient hospital medical admission." AR0043. Hospital inpatient care covers "[r]oom and board and general nursing care[.]" AR0053.

The Plan excludes certain services from its behavioral mental health coverage, including "educational services," "skills training," and "therapeutic camp services." AR0043. It also directs the reader to the Plan's General Exclusions. Relevant here, that ninety-item inventory excludes "[s]ervices primarily educational in nature, except as specified in the Benefit Chart." AR0076. It also excludes coverage for "[s]ervices for or related to recreational therapy (defined as the prescribed use of recreational or other activities as treatment interventions to improve the functional living competence of persons with physical, mental, emotional and/or social disadvantages)" and "educational therapy (defined as special education classes, tutoring, and other non-medical services normally provided in an educational setting)[.]" AR0077.

The Plan also defines several key terms. A "facility" is a "provider that is a hospital, skilled nursing facility, residential behavioral health treatment facility, or outpatient behavioral health treatment facility licensed under state law, in the state in which it is located to provide the health services billed by that facility." AR0104. A "residential behavioral health treatment facility," in turn, is:

> A facility licensed under state law in the state in which it is located that provides treatment by or under the direction of a doctor of medicine (M.D.) or osteopathy (D.O.) for mental health disorders, alcoholism, substance abuse or substance addiction. The facility provides continuous, 24-hour supervision by a skilled staff who are directly supervised by health care professionals. Skilled nursing and medical care are available each day. A residential behavioral health treatment facility does not, other than incidentally, provide educational or recreational services as part of its treatment program.

AR0110. By contrast, a "skilled nursing facility" is a "Medicare approved facility that provides skilled transitional care, by or under the direction of a doctor of medicine (M.D.) or osteopathy (D.O.), after a hospital stay. A skilled nursing facility provides 24-hour-a-day professional registered nursing (R.N.) services." AR0111. The definition of a covered skilled nursing facility does not impose a limitation that it may only incidentally provide educational or recreational services as part of its program. *See id.*

## CONCLUSIONS OF LAW

L.P. asserts two causes of action: (1) to recover benefits she claims are owed under the Plan pursuant to 29 U.S.C. §1132(a)(1)(B), and (2) to enjoin BCBSM from continuing its alleged violations of the Parity Act and provide equitable relief for the alleged violations pursuant to §1132(a)(3). As its counterclaim, BCBSM seeks a declaration that it "is entitled to reimbursement from J.P. for an amount to be proved at

trial, and such other relief as permitted by ERISA as interpreted in *Montanile v. Bd. of Trs. Of the Nat'l Elevator Indus. Health Ben. Plan*, 136 S. Ct. 651 (2016)." Def.'s Answer to Pls.' Am. Compl. and Am. Countercl. 12, Dkt. No. 34.

Perhaps because this is not a "typical" plan enforcement action under the Employee Retirement Income Security Act of 1974, the parties' positions did not fully coalesce until the last brief was submitted and oral argument heard. This is unfortunate, as the Court may have been better aided by briefing that homed in on each parties' strongest argument. But "[c]ases should be decided upon their merits whenever reasonably possible." *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986). On those merits, no party is entitled to all it requests at this stage of the litigation.

## I.    Legal Standards

### A.    Summary Judgment

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts in this District facing cross-motions for summary judgment view each motion in turn, viewing the record in the light most favorable to the non-moving party. *E.g.*, *Walker v. Hartford Life and Accident Ins. Co.*, Civ. No. 14-2031 (RHK/JJK), 2015 WL 12778778, at *5 (D. Minn. May 12, 2015), *R&R adopted by* 2015 WL 12780471 (D. Minn. June 22, 2015). When both parties proceed primarily on the administrative record, "a summary judgment motion is simply a vehicle to tee up a case for judicial review . . . ." *Stephanie C. v. Blue Cross Blue Shield of Massachusetts HMO Blue, Inc.*, 852 F.3d 105, 110 (1st Cir. 2017) (internal quotations omitted).

### B.    ERISA standard of review

The Employee Retirement Income Security Act of 1974 allows suits to recover benefits or otherwise enforce rights due under a covered plan. 29 U.S.C. § 1132(a)(1)(B). Generally, "a denial of benefits . . . is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If the administrator has such discretionary authority, then the Court reviews the denial for an abuse of that discretion. *See id.* The Plan at issue plainly grants BCBSM such discretion as the claims administrator. AR0095.

Parity Act claims diverge from this standard path, as it is not simply a matter of determining whether BCBSM hewed to its own contractual language. Rather, the question is whether BCBSM's Plan complies with the federal statute and accompanying regulations. *Firestone* notwithstanding, interpretation of a federal statute remains "a question of law subject to *de novo* review." *Munnelly v. Fordham Univ. Faculty*, 316 F. Supp. 3d 714, 727 (S.D.N.Y. 2018) (quoting *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 581 (2d Cir. 2006)). So, to the extent this case requires a determination regarding the Plan's compliance with the Parity Act, this Court owes BCBSM no deference.

## II.    J.P.'s Declaration

In its memorandum opposing L.P.'s Motion for Summary Judgment, BCBSM asks this Court to strike the Declaration of J.P. (Dkt. No. 55). This request faces a number of hurdles. "First, there is no such thing as a 'motion to strike'—at least when the paper being targeted is a memorandum or affidavit submitted in connection with a motion for

summary judgment." *Carlson Mktg. Grp., Inc. v. Royal Indem. Co.*, Civ. No. 04-3368, 2006 WL 2917173, at *2 (Oct. 11, 2006). There is simply no authority authorizing such a motion, as judges of this District have repeatedly noted. *Id.* (collecting cases). Further, the posture of the request—a sentence in a memorandum of law under a heading titled "Standard and Scope of Review"—leaves the Court uncertain whether a motion, to strike or anything else, is properly before it. BCBSM cites to *Hall v. Metropolitan Life Insurance Co.* to support its claim for relief, but even there the defendant filed an independent motion to strike. Civ. No. 13-3163 (MJD/BRT), 2015 WL 5472551, at *9 (D. Minn. Sept. 16, 2015).

Even if a proper motion to disregard the declaration were before the Court, the motion would be denied. Generally, "[r]eview of a plan administrator's discretionary decision must be limited to the administrative record[.]" *Ingram v. Terminal R.R. Ass'n of St. Louis Pension Plan for Nonschedule Emp.*, 812 F.3d 628, 634 (8th Cir. 2016). But that limitation is not applicable here. Courts regularly consider evidence outside the administrative record when a plan does not grant the administrator discretion, or when the extraneous evidence addresses equitable claims. *See, e.g.*, *Sepulveda-Rodriguez v. MetLife Grp., Inc.*, 2017 WL 6628116, at *11 (D. Neb. Dec. 28, 2017). J.P.'s declaration primarily addresses BCBSM's counterclaim, which seeks a declaration regarding its legal rights to recoup overpayments. This type of claim "do[es] not benefit from the administrative process." *Jensen v. Solvay Chem., Inc.*, 520 F. Supp. 2d 1349, 1355 (D. Wyo. 2007). BCBSM is attempting to vastly broaden the uncontroversial rule that a court reviewing "a plan administrator's discretionary decision" is limited to the record on which the decision was made into a rule embracing potentially any issue raised in an ERISA lawsuit, irrespective of its tethering to the administrative record. The Court will consider

10

J.P.'s declaration to the extent it provides facts relevant to the equitable issues raised by the parties.

**III.    L.P.'s Parity Act Claims**

Both of L.P.'s claims for relief rely upon the same alleged Parity Act violation, the only difference being the relief requested. She asserts two theories as to how BCBSM violated the Parity Act, both of which the Court addresses below.

**A.    The Parity Act**

Under the Parity Act, ERISA plans must "treat sicknesses of the mind in the same way that they would a broken bone." *New York State Psychiatric Ass'n, Inc. v. United Health Grp.*, 980 F. Supp. 527, 542 (S.D.N.Y. 2013), *aff'd in part, vacated in part*, 798 F.3d 125 (2d Cir. 2015). Specifically, The Act provides as follows:

> In the case of a group health plan (or health insurance coverage offered in connection with such a plan) that provides both medical and surgical benefits and mental health or substance use disorder benefits, such plan or coverage shall ensure that—
>
> ***
>
> (ii) the treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

29 U.S.C. § 1185a(a)(3)(A). A "treatment limitation" is a limit on either "the scope or duration of treatment." *Id.* (a)(3)(B)(iii).

Certain executive agencies, through a congressional conferral of authority, have promulgated regulations intended to guide and inform application of the Parity Act. *Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155, 1158 (9th Cir. 2018) (citing 29 U.S.C. § 1185a(g)). Those regulations focus the Court's analysis in two respects. First, both

"quantitative" and "nonquantitative" treatment limitations may run afoul of the Parity Act. 29 C.F.R. § 2590.712(a). Whereas a quantitative limitation is reduceable to a number, a nonquantitative treatment limitation is any other limitation on the scope or duration of treatment. *Id.* at (c)(4)(i). Relevant here, this includes "[r]estrictions based on geographic location, facility, [and] provider specialty . . . ." *Id.* at (c)(4)(ii).

Second, any limitation applied to mental health treatment must be scrutinized by comparing it to the limitations placed on an analogous medical or surgical treatment in the same classification. *Id.* at (c)(2)(i)-(ii). This step might pose a significant challenge in other cases, as the regulations recognize six classifications and insurers must consistently classify "intermediate" treatments into one of those categories. *Id.* Here, however, the overview to the Final Rules helpfully identifies skilled nursing facilities as the proper analogue to residential treatment facilities. Final Rules Under the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, 78 Fed. Reg. 68,247 (Nov. 13, 2013). Neither side challenges skilled nursing facilities as the appropriate analogue in this case.

The caselaw interpreting the Parity Act in the decade since its enactment also provides some guidance. Although the Parity Act does not expressly create a private right of action, an ERISA plan beneficiary may sue to enforce the provisions of the Act under ERISA's civil enforcement provisions, 29 U.S.C. § 1132(a). *E.g.*, *New York State Psychiatric Ass'n*, 980 F. Supp. 2d at 542. Further, a plaintiff may assert either a "categorical" or "as-applied" Parity Act violation. In a categorical challenge, also called a facial challenge, a plaintiff may show "that she was denied coverage for mental health or substance abuse services based on an existing limitation, in which case she must identify

that limitation and compare it to limitations imposed (or not imposed) on analogous medical or surgical services." *H.H. v. Aetna Ins. Co.*, 342 F. Supp. 3d 1311, 1319 (S.D. Fla. 2018); *see also A.Z. by and through E.Z. v. Regence Blueshield*, 333 F. Supp. 3d 1069, 1079 (W.D. Wash. 2018). A plaintiff may also bring an "as-applied" challenge wherein she may show "that the mental health or substance abuse services at issue meet the criteria imposed by her insurance plan and that the insurer imposed some additional criteria to deny coverage of the services at issue." *H.H.*, 342 F. Supp. 3 at 1319.

Although courts often classify Parity Act claims into one of these two categories, that classification matters little to the ultimate decision. "Regardless of whether the challenge is categorical or as-applied, the plaintiff 'must properly identify, either in the terms of the plan or the administrative record, the relevant treatment limitation supporting that charge.'" *Id.* (quoting *A.Z.*, 333 F. Supp. 3d at 1081). By recognizing as-applied claims in addition to facial claims premised on the plan language, courts simply have ensured that insurers cannot circumvent the law by administering in-parity plan language in a disparate manner. Beyond that purpose, there is little need for this Court to concern itself with labelling a particular Parity Act claim.

Apart from a general discussion of the law, the existing authority is otherwise unhelpful to analyzing the present claim.[5] Many of the cases were decided on motions to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure. It is difficult to analogize to those cases, as the courts there took the plaintiffs' allegations as true and were

---

[5] There is no binding authority for this Court to consider. The Supreme Court has not considered the Parity Act. The Eighth Circuit has cited an older version of the law only once, in a footnote, and in the context of ERISA preemption of state law. *See Daley v. Marriott Int'l, Inc.*, 415 F.3d 889 (8th Cir. 2005).

concerned only with whether the complaint stated a claim.  Moreover, many of the cases cited by the parties involved a distinctly different legal issue. In those cases, the insurance plan restricted coverage for wilderness programs or wilderness therapy, generally as a blanket restriction. *E.g.*, *A.G. v. Community Ins. Co.*, 363 F. Supp. 3d 834, 836, 841-42 (S.D. Ohio 2019); *Alice F. v. Health Care Serv. Corp.*, 367 F. Supp. 3d 817, 823-24 (N.D. Ill. 2019); *H.H.*, 342 F. Supp. 3d at 1316-17; *A.Z.*, 333 F. Supp. 3d at 1072-73; *Gallagher v. Empire HealthChoice Assurance, Inc.*, 339 F. Supp. 3d 248, 253 (S.D.N.Y. 2018). The courts resolved each of these cases in different ways, based upon the nature of the facility and the plan language. In many instances, resolution in favor of the plan administrator was easy because the exclusion was equally applied, and the facility was often not licensed by the state as a residential treatment facility.

The cases in which courts have found a Parity Act violation in the coverage of residential treatment facilities are also distinguishable. For example, in *Danny P.*, the plan at issue excluded room and board from its coverage of residential treatment facilities, despite covering such fees at skilled nursing facilities. 891 F.3d at 1157. The Ninth Circuit saw this as an obvious disparity. *Id.* at 158-59. And in *Munnelly*, the plan explicitly excluded residential treatment services from its mental health coverage, despite posing no corresponding limitation on medical services. 316 F. Supp. 3d at 732-34. By contrast, L.P.'s Plan plainly covers room and board at a residential treatment facility. The fighting issue here is how the Plan defines such a facility.

### B.    The Violation

L.P. offers two related but distinct theories of how BCBSM has violated the Parity Act. Under one theory, the Plan's definition of a residential behavioral health treatment

facility impermissibly adds requirements above and beyond those required for licensing in Missouri, while a Missouri-licensed skilled nursing facility would necessarily meet the Plan's requirements. This is unpersuasive. To understand why, one need simply imagine a plan that defines a residential treatment facility and skilled nursing facility identically— that is, any restrictions or limitations on one facility applies to the other verbatim. Nothing in the Parity Act forbids a plan from placing higher standards than those required by state licensing laws, as long as that standard is consistently applied. Although not identical to the present situation, an example in the regulations clarifies this point. In the example, a plan requires any provider to "meet the highest licensing requirement related to supervised clinical experience under applicable State law in order to participate in the plan's provider network." 29 C.F.R. § 2590.72(c)(4)(iii), Example 7. Despite disparately affecting coverage at mental health facilities in a state that requires post-degree supervised clinical training for master's-level mental health providers but not for master's level medical providers, the rule is consistently applied and so does not violate the Parity Act. *Id.* The upshot of the example is that state licensing laws that impose different requirements on mental health facilities than they do on skilled nursing facilities do not render plan language out of parity. By analogy, if the plan language imposes heightened requirements on such facilities beyond the requirements of state law, the plan does not violate the Parity Act as long as it imposes those heightened requirements evenly across the board. Thus, without something more here, this argument fails.

L.P.'s remaining theory, however, is more fruitful. The Plan violates the Parity Act by impermissibly denying any coverage at certain residential treatment facilities despite providing at least some coverage at analogous skilled nursing facilities. The Plan's

15

definition of a residential behavioral health treatment facility states such a facility may "not, *other than incidentally*, provide educational or recreational services as part of its treatment program." AR0110 (emphasis supplied). In other words, otherwise covered services provided by a residential treatment facility that offers more than incidental educational or recreational services are not covered; a beneficiary will not be reimbursed for otherwise covered facility charges incurred during a stay at that facility. The Plan imposes no such restriction on skilled nursing facilities.[6] AR0111.

This restriction, specific to residential treatment facilities, creates a disparity in coverage for facility-related fees and services and thus creates a "[r]estriction based on . . . facility type[.]" 29 C.F.R. § 2590.712(c)(4)(ii)(H). If a residential treatment facility meets the Plan's definition, the Plan covers room and board. AR0043, 0053. This is also true for skilled nursing facilities meeting the Plan's definition. AR0069. Under the General Exclusions applicable to both facilities, many educational and recreational *services* are not covered, even if the facility itself otherwise satisfies the Plan's requirements. However, only residential behavioral health treatment facilities lose all eligibility for coverage by providing such uncovered services more "than incidentally." A skilled nursing facility could satisfy the Plan's requirements despite offering more-than-incidental uncovered recreational services; BCBSM would still cover room and board, but not charges relating to those uncovered services.

---

[6] At oral argument, BCBSM argued L.P. violated the Local Rules by raising this theory for the first time in her reply brief. Although it was perhaps best articulated in the reply, L.P. presented an unrefined version of this argument in her original memorandum of law. *See* Pl.'s Mem. Law Supp. Summ. J. 14, 19-20, Dkt. No. 54. Much of the refinement is likely attributable to BCBSM's own argument distinguishing facility and service coverage. *See* Blue Cross's Reply Mem. Supp. its Mot. Summ. J. and Opp'n to Pl.'s Mot. Summ. J. 8, 11-12, Dkt. No. 60.

BCBSM's arguments that its Plan does not violate the Parity Act fail. It contends that the "other than incidentally" language actually grants more coverage for residential behavioral treatment facilities than skilled nursing facilities. The Plan's language belies such a conclusion. As BCBSM notes, both types of facilities are subject to the General Exclusions, which exclude coverage for recreational and educational services. AR0076-77. The only way to avoid rendering the "other than incidentally" language meaningless is to read it as an additional restriction on the *facility*. Reading it as a limited grant of coverage for *services* must either conflict with the General Exclusions or render it entirely superfluous. And, as already noted, the Plan allows a skilled nursing facility to offer uncovered services more than incidentally without denying coverage for appropriate services provided at the facility.

During oral argument, BCBSM also suggested that the Plan's language was the result of legitimate differences between the types of care, as stays at skilled nursing facilities occur only after hospitalization and are presumptively shorter than stays at residential treatment facilities. If no skilled nursing facilities offer educational or recreational services, then additionally restrictive language is unnecessary. This is a variation on a point propounded throughout BCBSM's briefing: The Plan covers L.P.'s mental healthcare, not her schooling. Granting BCBSM all its premises, the argument fails for the same reasons its prior argument failed. The General Exclusions list already excludes coverage for such services; the Plan imposes an additional restriction on the residential treatment facility itself.

Finally, BCBSM argues L.P. incorrectly concludes that all services at Change Academy are uncovered if the facility is uncovered, as the administrative record shows

BCBSM approved coverage for some therapy sessions during her stay. AR1229-36. To receive coverage for those sessions, however, L.P. had to submit the claims as outpatient visits and request that BCBSM reprocess the claims. *Id.* L.P. does not contend the Plan violates the Parity Act by denying outpatient benefits, which are an entirely separate classification under the regulations. This lawsuit is about an apparent disparity in coverage for inpatient benefits, particularly room and board. BCBSM's attempt to flip the narrative is unavailing.

### C.    The Need for Remand

The conclusion that BCBSM's Plan violates the Parity Act does not end this Court's analysis of L.P.'s claims; the question of an appropriate remedy must be addressed. The parties did not address this question in their briefs. At oral argument, L.P. requested remand only if the Court failed to find a Parity Act violation. BCBSM took a mirroring position, requesting remand if the Court found a Parity Act violation. For reasons neither party likely anticipated, the Court recommends the matter be remanded for further, limited development of the record. First, although the Court is skeptical, BCBSM may have articulated an alternative basis for denial of coverage separate from the Parity Act violation identified by the Court during the administrative appeal process. Second, L.P. may still not be entitled to all the benefits she requested.

### 1.    Physician oversight

BCBSM may have a separate basis for denying coverage untainted by the Parity Act violation. In its letter denying L.P.'s administrative appeal, BCBSM noted "[t]he physician reviewer determined that there is no evidence that the treatment is by or under the direction of a physician." AR1213. It raised this argument again during the litigation.

18

Blue Cross's Reply Mem. 16. Although L.P. tacitly challenged that basis by arguing the imposition of heightened credential requirements beyond Missouri's statutory requirements violated the Parity Act, the Court rejected her argument. It therefore may still be an independent basis for denying the coverage.

That noted, the Court cannot, on the present record, say whether BCBSM satisfies even the low bar imposed by the "abuse of discretion" standard of review. Although BCBSM concluded there was "no evidence" of physician oversight, the record shows L.P. met with an M.D. for therapy sessions on several occasions during her time at Change Academy. *E.g.*, AR2580, AR2599, AR2606, AR2667. This is at least some evidence that a physician oversaw L.P.'s treatment. However, because this is purely an interpretation of the Plan terms to which the administrator is owed deference, the Court cannot conclude on these bare facts that the decision was entirely arbitrary. Nor can it conclude that BCBSM did not abuse its discretion by ignoring this evidence. Therefore, remand to the claims administrator is appropriate for L.P. to submit any additional evidence of physician oversight and for BCBSM to further develop its findings and rationale on the same. *See Abram v. Cargill, Inc.*, 395 F.3d 882, 887 (8th Cir. 2005), *abrogated in part by Midgett v. Washington Grp. Int'l Long Term Disability Plan*, 561 F.3d 887 (8th Cir. 2009) (remanding for further development of the claims administrator's rationale).

### 2.    Amount of benefits improperly denied

Assuming L.P.'s treatment was overseen by a physician, the Court cannot say precisely the amount of benefits for which BCBSM improperly denied coverage. The record establishes a Parity Act violation and the value of the claims J.P. submitted to BCBSM for reimbursement. But the record does not clarify whether these claims are

properly associated with the legitimate mental health care L.P. received at Change Academy.

Setting the Parity Act violation aside, the Plan still denies coverage for recreational and educational services, a coverage restriction applied equally to residential treatment facilities and skilled nursing facilities. Yet, most of L.P.'s claims from Change Academy were submitted under an all-inclusive room and board code. AR2666. It is impossible to tell which claims are properly attributable to room and board consistent with a long-term stay at a residential treatment facility and which, if any, are an attempt to lump in the costs of uncovered services received at a covered facility. If the Court were simply to grant L.P. all the relief she requests, then it would risk creating a disparity of a different nature by affirmatively granting coverage for services the Plan explicitly does not cover. The only way to ensure both the Parity Act and the non-offending language of the Plan are fully enforced is to remand and allow L.P. and J.P. to resubmit the claims, appropriately coded, and allow BCBSM to reprocess the claims consistent with this Recommendation.[7]

## IV.    BCBSM's Counterclaim

Lastly, the Court turns to BCBSM's counterclaim for a declaration regarding its right to recover any purported overpayment it made to J.P. BCBSM argues the Plan gives it the right both to recoup from future benefits and to attempt to trace the funds already

---

[7] The recommended remand does not give BCBSM the right to consider medical necessity for the first time. During oral arguments, BCBSM requested remand, if the Court found a Parity Act violation, to reach the question of medical necessity. BCBSM failed to offer that as a basis for its decision during the administrative review, despite having an "antecedent duty . . . to provide [L.P.] with notice and review" of its grounds for denial. *Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.2d 1079, 1085 (8th Cir. 2009). This Court will not entertain this attempt at benefits denial ping-pong, in which BCBSM attempts to find other, apparently post hoc, grounds that L.P. was not given the chance to exhaust during her mandatory administrative appeal.

given to J.P. Had the Court granted L.P. all the relief she requested, BCBSM's counterclaim would be moot because there would be no need to declare its rights to recover money it had no right to recover at all. The Court's decision to remand for limited purposes, however, invokes that related specter of justiciability: ripeness.

Like mootness, the ripeness doctrine effectuates Article III's limitation of federal jurisdiction to actual "cases" and "controversies." Whereas mootness prevents a court from considering a matter where the threat of injury has been removed, ripeness guards against the "premature adjudication" of "abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967). The ripeness requirement also finds support in prudential considerations that a court should not wade into a dispute before the facts have sufficiently developed, even if doing so would not otherwise upset the Constitution. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (citing *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n. 18 (1993)). "[E]ven in a case raising only prudential concerns, the question of ripeness may be considered on a court's own motion." *Id.* at 808.

To determine whether a matter is ripe, this Court must consider both the "fitness of the issues for judicial decision" and "the hardship to the parities of withholding court consideration." *Abbott Labs.*, 387 U.S. at 149; *see also Nebraska Pub. Power Dist. V. MidAmerican Energy Co.*, 234 F.3d 1032, 1039 (8th Cir. 2000) (holding that a party must "satisfy both prongs to at least a minimal degree"). This inquiry is necessarily "a question of degree[,]" a fact made particularly acute in the context of an action seeking declaratory relief. *Pub. Water Supply Dist. No. 8 of Clay Cty., Mo. v. City of Kearney, Mo.*, 401 F.3d 930, 932 (8th Cir. 2005).

In the present case, even a scintilla more certainty of the facts would render the matter ripe for judicial consideration. Presently, however, the threat of injury hinges upon the remand, and so the Court declines jurisdiction. It is possible that the outcome of remand will be the parties "return[ing] here shortly, making precisely the same arguments, with nary a scintilla of additional relevant evidence." *Nebraska Pub. Power Dist.*, 234 F.3d at 1039. But it is also possible that BCBSM, after reprocessing L.P.'s claims, will have no overpayment to recover, either because it approves all the disputed claims or, if it still denies coverage of certain claims, it has already recouped the funds. If there is no overpayment, then there is no injury certainly impending.

The Eighth Circuit's opinion in *Public Water Supply District No. 8* is instructive on this point. There, the plaintiff, a water supply district, sought a declaration that the defendant, a municipality, could not sell water to property owners if their property was detached from the district. *Pub. Water Supply*, 401 F.3d at 933. Various property owners had commenced proceedings in Missouri state court to have their property detached, and the defendant municipality had promised to sell the property owners water if they succeeded. *Id.* All of the property remained a part of the water supply district at the time of the federal appeal, as the Missouri Court of Appeals had overturned two trial court decisions granting detachment after finding the trial courts had not sufficiently considered a preemption argument. *Id.* at 932. The Eighth Circuit concluded the case was not ripe. If the properties were already detached, it reasoned, then the municipality's promise would have made the threat of injury to the district sufficiently imminent to support the exercise of federal jurisdiction. *Id.* at 933 As the record existed, however, the court could not say

22

that any of the property owners would win in the state court proceedings and so any declaration regarding the district's rights would simply be too advisory. *Id.*

This Court faces a similar dilemma. Like in *Public Water Supply*, the outcome of the uncertain proceedings—here, the remand—ultimately may not contribute significantly to the Court's ability to answer the legal question BCBSM poses. If BCBSM still claims it overpaid J.P., the reason why or the exact amount will bear little on the question of how BCBSM may recover it. But, perhaps even more so than in *Public Water Supply*, the imminence of the purported threatened injury is now too distant, and any opinion would be advisory, requiring the Court to assume an overpayment. Even when a party seeks a declaratory judgment, there must be an "actual controversy." 28 U.S.C. § 2201(a). The imminence of the harm underlying that controversy must be clear at the time the Court considers the question of ripeness, not just when the party brings the claim. *Nebraska Pub. Power Dist.*, 234 F.3d at 1039. Because the harm to BCBSM is uncertain in light of the remand, the Court cannot entertain its counterclaim at this time.

## RECOMMENDATION

For the reasons set forth above, the Court RECOMMENDS THAT:

1.    Defendant's Motion for Summary Judgment [Dkt. No. 44] be DENIED.

2.    Plaintiff's Motion for Summary Judgment [Dkt. No. 52] be GRANTED IN PART and DENIED IN PART.

3.    The matter be REMANDED to the Plan Administrator to:

      a.    Consider additional evidence regarding physician oversight of L.P.'s care;

b.    Allow L.P. to resubmit the benefits claims with appropriate billing codes and

reprocess those claims.

Dated: January 17, 2020                          s/David T. Schultz_____
                                                 DAVID T. SCHULTZ
                                                 United States Magistrate Judge

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).