# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

L.P., by and through her father, J.P.,
individually and on behalf of all others
similarly situated,

> Plaintiff,

v.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 18-1241 (MJD/DTS)

BCBSM, Inc. d/b/a Blue Cross and
Blue Shield of Minnesota,

> Defendant and Counterclaimant

v.

J.P.,

> Counter Defendant.

Charles N. Nauen, David W. Asp, Jennifer Jacobs, and Susan E. Ellingstad,
Lockridge Grindal Nauen PLLP, and Jordan M. Lewis, Jordan Lewis, P.A.
Counsel for Plaintiff and Counter Defendant.

David M. Wilk, Larson King, LLP, and Joel Allan Mintzer, Blue Cross and Blue
Shield of Minnesota, Counsel for Defendant.

## I.   INTRODUCTION

1

This matter is before the Court on Plaintiff's Motion for Judicial Review Following Remand, Entry of Judgment, and Attorney's Fees [Docket No. 94] and Defendant's Letter Request for Permission to File Motion for Reconsideration [Docket No. 106].

## II.    BACKGROUND

### A.    Factual Background

When Plaintiff LP was a teenager, she suffered from mental-health concerns such as such as depression, suicide ideation, self-harm, and reactive attachment disorder, which led her parents to enroll her for inpatient treatment at Change Academy at Lake of the Ozarks ("Change Academy"), a Missouri residential treatment center, from June 30, 2016 through November 6, 2017. ([Docket No. 31] Am. Compl. ¶¶ 10, 14.)  At that time, LP was covered under a self-funded employee benefits plan sponsored by Bolton & Menk, Inc. ("Bolton & Menk") the employer of her father, JP, and administered by Defendant BCBSM, Inc. d/b/a Blue Cross and Blue Shield of Minnesota ("Blue Cross").  (Id. ¶¶ 7, 10.) Change Academy was an out-of-network, non-participating provider, so JP paid Change Academy's bills directly and then sought reimbursement from Blue Cross.  (Id. ¶ 15.)

Blue Cross paid $83,554.55 to JP toward some Change Academy claims, denied other claims, and later determined that none of the claims were covered. ([Docket No. 68] Report and Recommendation ("R&R") at 4-5.)

LP appealed Blue Cross's denial of the Change Academy claims. (R&R at 5.) In March 2018, Blue Cross upheld its denial on the grounds that Change Academy was not a qualified residential behavioral health treatment facility as defined in LP's Plan. (R&R at 5; Mintzer Decl., Ex. A, Original Administrative Record, AR1213.) Under the Plan, a residential behavioral health treatment facility is a facility licensed under state law providing inpatient treatment for mental health disorders, alcoholism, substance abuse, or substance addiction, under the direction of a doctor and "does not, other than incidentally, provide educational or recreational Services as part of its Treatment program." (AR268.) In its final denial letter, Blue Cross stated that it denied the Change Academy claims because the facility provided substantial recreational services, there was a lack of required physician oversight, and the fact that "the charges are being submitted under an all-inclusive room and board code (1001) which identifies these services as hospital-based. The facility does not appear to be hospital-based." (AR1213.)

3

**B.     Procedural History**

**1.     Claims Asserted**

On May 5, 2018, LP, by and through her father, JP, filed a Complaint against Blue Cross in this Court.  [Docket No. 1]  On January 9, 2019, LP filed an Amended Complaint against Blue Cross.  [Docket No. 31]  LP alleges that Blue Cross's definition of a residential behavioral health treatment facility violates the Mental Health Parity and Addiction Equity Act of 2008 ("Parity Act") because it "impose[s] requirements for coverage . . . that go beyond states' licensing requirements" but does not impose similar requirements for services rendered at skilled nursing facilities.  (Am. Compl. ¶ 41.)  LP seeks benefits as well as a clarification of her rights to future benefits pursuant to 29 U.S.C. § 1132(a)(1)(B), and she asserts a breach of fiduciary duties pursuant to 29 U.S.C. § 1132(a)(3).  (Am. Compl.  ¶¶ 32, 43-44.)  The Amended Complaint seeks to certify the following nationwide class, excluding persons who received treatment at entities in eight specified states:

> All persons who are covered under any ERISA-governed health benefit plan insured and/or administered by Blue Cross that (1) provides coverage for mental or nervous disorders or substance abuse care and (2) who sought coverage for treatment at one or more residential treatment center therapy programs that occurred during the applicable class statute of limitation, and (3) whose claims were not denied based on a "medical necessity" determination.

4

(Id. ¶ 19.)

Blue Cross filed an Amended Counterclaim against JP seeking to recover the amount of overpayments it made to JP when it paid claims relating to LP's services at Change Academy in error.  [Docket No. 34]

### 2.    Summary Judgment Decision

Blue Cross and LP filed cross motions for summary judgment.  [Docket Nos. 44, 52]  Blue Cross noted that Missouri licensing rules required that Change Academy arrange schooling, argued that the Plan covers health services, not private schooling, and warned that, "[i]f Change Academy provides more than incidental educational services, Change Academy could fold its educational costs into the bill it submits to the health plan.  ([Docket No. 60] Blue Cross Reply at 8.) In LP's Reply, she argued that Blue Cross's definition of a residential behavioral health treatment facility violates the Parity Act because it "categorically excludes *all services* provided by *facilities* not covered under the definition." ([Docket No. 62] LP Reply at 10.)

Magistrate Judge Schultz issued a Report and Recommendation recommending that Blue Cross's motion for summary judgment be denied and Plaintiff's motion for summary judgment be granted in part and denied in part.

(R&R at 23.)  The R&R reasoned that Blue Cross's policy definition of "residential behavioral health treatment facility" violated the Parity Act because, unlike skilled nursing facilities, the Plan does not cover covered services provided at facilities that provide more than incidental educational or recreational services. (R&R at 15-16.)  This constituted an additional restriction on facilities, not services, because otherwise the Plan's separate exclusions for educational and recreational therapy would be superfluous.  (Id. at 17.)  However, because Change Academy had submitted its claims under an all-inclusive room and board code, "[i]t is impossible to tell which claims are properly attributable to room and board consistent with a long-term stay at a residential treatment facility and which, if any, are an attempt to lump in the costs of uncovered services received at a covered facility."  (Id. at 20.)  Requiring Blue Cross to pay all of the claims submitted by Change Academy on the current record

> would risk creating a disparity of a different nature by affirmatively granting coverage for services the Plan explicitly does not cover. The only way to ensure both the Parity Act and the non-offending language of the Plan are fully enforced, is to remand and allow L.P. and J.P. to resubmit the claims, appropriately coded, and allow [Blue Cross] to reprocess the claims consistent with this Recommendation.

(Id. (footnote omitted).)

6

The R&R also denied summary judgment on Blue Cross's counterclaim because it was not ripe.  (R&R at 20-23.)  It reasoned that it was possible that after Blue Cross reprocessed LP's claim, Blue Cross would "have no overpayment to recover, either because it approves all the disputed claims, or if it still denies coverage of certain claims, it has already recouped the funds."  (Id. at 22.)

The Court adopted the R&R and remanded the matter to the Plan Administrator to "[c]onsider additional evidence regarding physician oversight of L.P.'s care and [] [a]llow L.P. to resubmit the benefits claims with appropriate billing codes and reprocess those claims."  [Docket No. 84]

### C.    Blue Cross Claims Processing System

Blue Cross explains that calculating LP's benefits for Change Academy services involved four steps: (1) determining the correct billed charge, one that excludes non-covered services; (2) determining the allowed amount, and if the allowed amount depends on the particular services, what codes apply; (3) determining LP's financial responsibility toward the allowed amount, taking into account deductibles and co-insurance; and (4) determining the Plan's financial responsibility, taking into account previous payments.

Under LP's Plan, participants may choose any eligible provider of health services.  (AR18.)  The Plan distinguishes between in-network providers and out-

of-network providers and, as to out-of-network providers, some providers are

"participating"—meaning that they have a contract with Blue Cross of

Minnesota or a different Blue Cross plan—and some providers are

nonparticipating – meaning that they have no contract with any Blue Cross plan.

(AR18; AR222–25.)  Change Academy is an out-of-network, non-participating

provider ("non-par provider").  (ARR1501-2.)

When obtaining care from a non-par provider, the benefit is based on an

"allowed amount" rather than a provider's billed charge.  Because the non-par

provider is not under contract, the non-par provider can bill the member for the

difference between the allowed amount and its sticker price.  (ARR224.)  Under

the Plan, members are responsible for paying: (1) charges that exceed the allowed

amount; (2) deductibles and coinsurance; (3) copays; (4) charges that exceed the

benefit maximum level; and (5) charges that are not covered, including services

that Blue Cross determines are not covered based on claims coding guidelines.

(AR22; AR224–25.)  The allowed amount for non-par providers is based upon

one of the following payment options: (1) a percentage, not less than 100%, of the

Medicare Allowed Charge for the same or similar service; (2) a percentage of

billed charges; (3) pricing determined by another Blue Cross or Blue Shield plan;

or (4) pricing based upon a nationwide provider reimbursement database. (AR224, 262–63.)  The payment option selected may result in an allowed amount that is a lower amount than if calculated by another payment option.  (Id.)

For LP's Plan, Blue Cross uses the price determined by the Blue Cross affiliate where the services were performed (here, Blue Cross Missouri) and, if none is provided, then 30% of the billed charge.  (ARR1473r–74r.)

### D.    Remand

#### 1.    LP's May 4, 2020 Submission

On May 4, 2020, LP submitted a letter to Blue Cross with declarations and exhibits.  (ARR28-1299.)  A declaration and curriculum vitae showed that psychiatrist Satnam Mahal, M.D., was the admitting and treating provider and oversaw and directed LP's treatment at Change Academy, demonstrating physician oversight.  (ARR30-32, 35-36, 1304.)

LP also submitted evidence purporting to show that Change Academy's claims were appropriately submitted under Revenue Code 1001 as all-inclusive bundled charges.  (ARR32-33, 1197.)  Jessica Anderson, a residential treatment facilities billing expert, stated it is "standard billing practice in the health insurance industry for residential treatment centers to 'bundle' billing for all services provided during residential treatment under the CMS-approved

revenue code 1001," and "health insurers generally require residential treatment centers to 'bundle' charges."  (ARR1298, Anderson Decl. ¶¶ 3-4.)  Anderson opined that if a residential treatment center unbundled charges, a health insurer could reject the claim and might even accuse the center of a fraudulent attempt to double-bill.  (ARR1299, Anderson Decl. ¶ 5.)  However, LP stated that, if Change Academy were to unbundle academic charges, that would be $145.14 per school day for a total of $49,057.32 in academic charges.  (ARR33.)

LP further submitted an alternative claims calculation including a list of unbundled charges identifying each individual service.  (ARR1197.)  Shellie See, Change Academy's Utilization Review Director, explained this was "not a complete list of services paid by the family because not all services have a CMS-assigned CPT code.  The medical billing standard requires residential treatment be billed by Revenue Code 1001."  (Id.)  See created a Daily Rate spreadsheet for LP, breaking down each day of her year and a half of treatment into daily rates for "Residential Services (therapeutic & medical)," room and board, and "Academic/Education (school days)," and estimated the approximate monthly totals in each category; she also provided a list of additional services not included in the daily rate and as-needed services.  (ARR1199, 1202-12.)  A

10

spreadsheet breaking these down with assigned five-digit CPT codes was attached as well.  (ARR1213-37.)  (Although Change Academy charges an all-inclusive rate to patients, it "occasionally must estimate the cost of the academic portion of its services, for example, when school districts reimburse [Change Academy] for the estimated educational costs for a patient," and, during the time that LP was a patient at Change Academy, it "estimated the academic cost per school day to be $145.14."  (ARR1305, Vandevoort Decl. ¶¶ 11-12.))

### 2. Blue Cross's June 3, 2020 Response

Blue Cross responded on June 3, 2020, stating that it had "completed our review and determined that no benefits can be allowed at this time."  (ARR1353.) It agreed that LP had shown that the treatment was "by or under the direction of a doctor."  (ARR1358.)  However, it rejected the claims coding LP had submitted. Blue Cross stated it "does not require bundling for health plans such as Bolton and Menk's," and that, "even where an all-inclusive billing code may be used, under Blue Cross and industry standards it is not proper for providers to bundle noncovered services into Revenue Code 1001."  (ARR1359.)  Blue Cross stated, "[y]our plan does not cover the costs of a high school education."  (ARR1358.) "Your plan does not cover recreational therapy. . . .  Canine and Adventure

11

Therapy are excluded because it is a prescribed use of recreational activities for therapeutic services."  (ARR1359.)  Seventeen hours a week were devoted to canine and adventure therapy.  (Id.)  "Recreational therapy" is "defined as the prescribed use of recreational or other activities as treatment interventions to improve the functional living competence of persons with physical, mental, emotional and/or social disadvantages."  (AR77, 220.)

Blue Cross also objected that Change Academy's bills were a "false representation" because Change Academy billed Blue Cross a daily rate greater than it billed JP: JP was billed $409 per day, yet Change Academy billed Blue Cross $634 per day or $509 per day.  (ARR1358.)  Blue Cross explained that the Plan "does not cover expenses that are not incurred."  (Id.)  (Change Academy averred that JP only paid $409 per day under a "self-pay discount."  (ARR1305, Vandevoort Decl. ¶ 10.))  And, while Change Academy submitted claims to Blue Cross for $634 per day for treatment in February 2017, it billed JP $409 per day for the same time period and marked the bill "**PAID IN FULL**."  (Compare AR653 with ARR1255.)  For treatment in August 2016, Change Academy marked the bill "**PAID IN FULL**" when JP paid $409 per day, but yet submitted a claim

to Blue Cross for $509 per day for the same days of treatment.  (Compare AR337
with ARR1248.))

Blue Cross further objected that Change Academy's charges included
charges for services on days when LP was not at Change Academy.  (ARR1358.)
According to the evidence submitted by LP on remand, LP had multiple home
visits during certain months and there were corresponding gaps of a few days in
her daily progress notes during each of those months and in other months, as
well.  (Id.)

Blue Cross noted that, "[a]s directed by the Court, Blue Cross did not
consider medical necessity in reaching this outcome;" however, it noted that if it
had done so, it would have determined that LP's stay at Change Academy was
not medically necessary.  (ARR1360.)

Blue Cross further objected that Change Academy improperly coded Dr.
Mahal's services, because, for example, all 15 visits in 2016 were coded for
medication management but LP was not on any medication and visit notes state
that school is going well and then other documentation states LP was not
attending school at that time due to anxiety.  (ARR1360.)

Blue Cross's stated "[o]utcome" was: "Blue Cross cannot process your claims because the billed amount is greater than the amount you incurred, and because Change Academy bundled non-covered educational and recreational services into its billed charge.  You may submit corrected and unbundled charges within 30 days of this letter."  (ARR1359-60.)

### 3.   LP's June 17, 2020 Letter

On June 17, 2020, LP sent Blue Cross a letter stating that Blue Cross "already has the information it needs to process claims for services" because LP's May 4 letter included both the Code 1001 charge and the unbundled charges for each individual service.  (ARR1410.)  LP asked Blue Cross to identify which codes Change Academy should have used instead of Code 1001.  (Id.)  She noted that Blue Cross of Tennessee's website states that Code 1001 is required for "Non-Acute Residential Treatment Psychiatric" services.  (Id.)

### 4.   Blue Cross's June 22, 2020 Response

On June 22, 2020, Blue Cross responded that it "does not unilaterally alter a provider's coding or billing charges," and "cannot direct non-participating providers . . . to submit particular codes."  (ARR1412-13.)  It argued that Blue Cross of Tennessee's billing guidelines only apply to entities contracting with

Blue Cross of Tennessee.  (ARR1413.)  With regard to the days that LP was absent, Blue Cross noted that the "Plan does not condone fraud or an intentional misrepresentation of a material fact" and informed LP that if she was not physically present at Change Academy on each day for which she seeks reimbursement, she must specify the dates that she was not present.  (Id.)

Blue Cross attached a document created on May 27, 2020, by "a professional coder at Blue Cross," which appears to be that coder's answers to a list of questions posed, including: "When care is by or under the direction of a physician, should the services of that physician be bundled within revenue code 1001?  [Answer:] Medical management and therapy services can be billed separately from revenue code 1001 (Residential treatment—psychiatric) Other treatment services have revenue codes assigned to each service within the range of 090X and 091X."  (ARR1351.)

### 5.    LP's July 10, 2020 Letter

On July 10, 2020, LP submitted a letter with additional declarations and exhibits.  (ARR1415.)  She asked Blue Cross to identify the codes it believes should apply, claiming that such information must be provided because "a claimant shall be provided, upon request and free of charge, reasonable access to,

and copies of, all documents, records, and other information relevant to the claimant's claim for benefits."  29 C.F.R. § 2560.503-1(h)(2)(iii).  (ARR1416.)  She asked whether Blue Cross claimed that improper coding itself was a basis to deny benefits.  (ARR1416.)

LP reiterated as she had argued in her May 4 letter, that Code 1001 was the appropriate code based on declarations from Change Academy and a coding professional at another residential treatment center.  (ARR1416.)  She argued that the code range 090X to 091X was inappropriate because it applies to "supplemental professional outpatient services that do not reflect the institutional claims" and thus are not appropriate.  (ARR1417.)  LP noted that Blue Cross's website stated that patients at inpatient facilities always will receive other services that contribute to their health but are not independently covered by or billed to insurance.  (Id.)

LP argued that Change Academy's services should not be separated out into individually billed services because residential treatment centers do not bill that way, Blue Cross does not require medical and surgical patients to separate charges, and every inpatient facility provides services that are not individually billed to or specifically covered by insurance.  (ARR1418-19.)  If Blue Cross

rejected the universal Code 1001, LP suggested subtracting the approximate cost of providing educational services from the total charges for her treatment or adding up a la carte the professional services provided as if they had been provided outpatient.  (ARR1419.)  She asserted that educational expenses were no more than 19% of the daily cost of Change Academy.  (Id.)

LP stated that Change Academy charges patients a per diem rate for all days enrolled, even for the days that they are on a home visit. (ARR1419 n.1.) She agreed that Blue Cross could exclude any amount paid for days when LP was away from Change Academy.  (Id.)  She attached spreadsheets from Change Academy that excluded 33 days that LP was on a home visit.  (ARR1445-64; see also ARR1467, Fults Decl. ¶ 14.)

### 6.    Blue Cross's August 10, 2020 Response

Blue Cross responded on August 10, 2020 that it was still "unable to reprocess [LP's] claims."  (ARR1497.)  It stated: "While you provide information and a methodology for removing non-covered academic services from Change Academy's charges, you do not do the same for the noncovered recreational therapy expenses."  (Id.)

Blue Cross explained that JP's employer, Bolton & Menk, had instructed it to determine pricing for nonparticipating providers by using pricing from another Blue Cross plan and, absent that, to "apply a percentage of the billed charges." (ARR1501.) Blue Cross stated that it "is not able to obtain pricing by another Blue Cross [] plan," because the charges originally submitted to Blue Cross of Missouri included non-covered services and falsely represented the amount billed to LP. (ARR1501-02.) And the information that LP submitted on remand was "not sufficient" because it did not include "the correct charge amount." (ARR1502.)

Blue Cross stated it "could use the billed charge to determine the allowed amount" and would allow 30% of that amount, after the deductible. (ARR1507; ARR1502.) But then Blue Cross asserted it could not do this either because it still "need[ed] to know the extent to which non-covered serviced [sic] were included in the charges that [Change Academy] billed to you." (ARR1502.)

Blue Cross stated that Code 1001 might be the proper code for residential services, but not for Change Academy because it "include[d] non-covered services within that code." (ARR1503.) It agreed that the codes Change Academy used in previously submitted exhibit were outpatient codes, "[b]ut

18

Blue Cross disagrees that inpatient codes are not available," because "Revenue Codes 090X and 091X are inpatient codes."  (ARR1504.)  "If a member accurately completes a subscriber claim form, Blue Cross will identify proper codes . . . and process the claims."  (<u>Id.</u>)

With regard to using Code 1001 and then subtracting uncovered charges, Blue Cross notes that while LP suggested a pro rata reduction for academic services, there was no calculation for a reduced charged amount for non-covered recreational therapies.  (ARR1505.)  However, "[i]f the Court determines that Blue Cross should calculate a reduction for non-covered recreational therapies based on the information provided, Blue Cross would estimate a pro-rata reduction because you conceptually agreed to that method with respect to academic services."  (ARR1505.)  Blue Cross noted that canine and adventure therapy made up 17 of the 46 hours of weekly therapy, so Blue Cross "would apply a pro-rata reduction of 36.95% (17/46) to the therapy portion of your charges."  (<u>Id.</u> (footnote omitted).)  Blue Cross proceeded to then calculate benefits by subtracting the days LP was not receiving care, applying the 30% allowed amount for services by non-par providers, and determining Blue Cross's financial responsibility by calculating coinsurance and deductibles.  (ARR1505-

07.)  Blue Cross determined that it was unable to reprocess LP's claims because

she failed to provide information to remove recreational therapy services;

however, if Blue Cross did apply the estimated pro rata reduction for academic

services and recreational therapies, the allowable benefit would have been

$32,028.16.  (ARR1507.)  Blue Cross noted that this amount is less than the

amount it already paid in error and is entitled to offset.  (Id.)

### 7.    LP's October 1, 2020 Letter

On October 1, 2020, LP responded.  (ARR1588.)  She argued that Blue

Cross does not reduce the amount of properly coded claims at other residential

treatment centers with which Blue Cross has a contract simply because the

provider also provides non-covered services, and that LP received room and

board and all services necessary for reimbursement under Code 1001, including

group, family, and individual therapy.  (ARR1590-91.)  She further asserted that

rejecting Code 1001 violated the Parity Act by placing more restrictive limitations

on inpatient mental health treatment than on comparable medical or surgical

care.  (ARR1591.)  She claimed that "recreational" therapy, such as animal-

assisted therapy, are common interventions prescribed in both medical and

mental health treatment, and skilled nursing facilities' rates are not reduced

when they offer them.  (Id.)  She argued that Change Academy's canine and adventure therapy are not recreational activities, but rather are recognized medical treatment for mental health conditions and medical conditions like seizure disorders and hearing impairment.  (ARR1593.)  LP attached a letter from Change Academy stating that canine therapy is a medical treatment for mental health conditions and adventure therapy is group therapy in a real-world environment.  (ARR1597-98.)

LP reiterated her position that Blue Cross should cover the full charges at the allowed amount for nonparticipating out-of-state providers under Code 1001 (ARR1591-92); alternatively, Blue Cross could deduct the dollar amount of charges for educational services (ARR1592); or, Blue Cross could add up the covered services based on recognized outpatient CPT codes (ARR1593).  She also attached a chart from Change Academy showing the amounts billed to and paid by Blue Cross of Missouri in 2016 and 2017, which averaged a $467 per day daily amount allowed.  (ARR1598-1601.)  The chart contained no detail and did not specify which claims administrators or plans were involved.

### 8.     Blue Cross's November 11, 2020 Response

On November 11, 2020, in response to direction from Magistrate Judge Schultz, Blue Cross wrote an email to LP listing the additional information it needed to process her claims.  (ARR1810-11.)  Blue Cross reiterated that it needed to know all of the dates that LP was not at Change Academy and the amount of the $409 self-pay daily charge attributable to adventure and canine therapy, among other things.  (Id.)

### 9.     LP's November 19, 2020 Response

On November 19, 2020, LP responded that she would provide information regarding the dates that she was not at Change Academy and a minor calculation error, but she would not provide information regarding calculation of the portion of the daily charge attributable to adventure and canine therapy, the self-pay discount, application of codes 090X and 091X, or information regarding the Change Academy chart showing billings to and payments from Blue Cross of Missouri such as whether those plans excluded educational and recreational services, because that information had already been provided or was not relevant.  (ARR1814.)

### 10.     LP's December 18, 2020 Letter

On December 18, 2020, LP wrote to Blue Cross with additional information, accepting that $175,870 was the amount that JP paid for 430 days of treatment at Change Academy, identifying one additional off-campus date, and claiming that, without providing the detail requested by Blue Cross, the chart attached to the October 1 letter that showed Blue Cross of Missouri's previous payments to Change Academy for LP's services demonstrated that Blue Cross's decision to allow 30% of billed charges was arbitrary and capricious.  (ARR1818-19.)

### 11.     Blue Cross's December 30, 2020 Letter

On December 30, 2020, Blue Cross wrote that it had treated LP's November 3 letter as an appeal, and it had "completed our review and are unable to reprocess your claims."  (ARR1855.)  Blue Cross argued that LP did not provide a way to remove "non-covered recreational therapy expenses" from her submitted charges.  (Id.)  Blue Cross again stated it "lack[ed] the necessary information to determine the correct billed charge" to use either local plan pricing or a percentage of billed charges, because it could not calculate the "amount (or proportion) of . . . charges . . . for non-covered recreational therapy."  (ARR1863.)

Blue Cross noted that it had provided its best estimation of the proportion of billed charges related to recreational therapy, but LP objects to its methodology and Blue Cross agrees that its calculation is "somewhat speculative, though it was based on information [LP had] provided." (ARR1864-65.)  Blue Cross stated it had provided LP the proper codes – 090X-091X – and stated LP had not "explain[ed] why the information Blue Cross supplied is not sufficient." (ARR1865.)  It also claimed that Change Academy's records were not reliable or credible.  (ARR1865-66.)

Blue Cross stated that it could not obtain the rates from Blue Cross Missouri until it had the correct billed charge, and, if it were to learn the "proper (and lower) billed charge," it would "need[] to reach out to Missouri anew." (ARR1867.)  The charge that Change Academy had provided purporting to show previous reimbursements by Blue Cross was not relevant because LP had refused to answer Blue Cross's questions regarding the identity of the claims administrators and plan language regarding the listed claims; while LP's Plan excluded "educational services and recreational therapy, other health plans might not have those exclusions."  (ARR1866-67.)  Also, in the past, Change Academy had fraudulently represented that it was entitled to a higher daily rate

when it had been paid in full for a lesser amount and had represented that it

provided services on days that LP was not present.  (<u>Id.</u>)

Blue Cross concluded: "Based on the information you provided, Blue

Cross is not able to reprocess your claims."  (ARR1868.)  Because LP did not

provide "information and a methodology for removing . . . non-covered

recreational therapy expenses," Blue Cross "cannot determine an allowed

amount by applying a percentage of billed charges."  (<u>Id.</u>)

### E.    Motions Before the Court

LP has now filed a Motion for Judicial Review Following Remand, Entry of

Judgment, and Attorney's Fees.  [Docket No. 94]  She requests that the Court

order Blue Cross to pay $150,192.98 in benefits, her reasonable costs and

attorneys' fees, and prejudgment interest.

Blue Cross has filed a letter request to file a motion for reconsideration of

the Court's Order adopting the Report and Recommendation and holding that

Blue Cross violated the Parity Act.  [Docket No. 106]  It asserts that the

proceedings on remand demonstrated how the language in the Plan does not

violate the Parity Act.

## III.    MOTION FOR JUDICIAL REVIEW

### A.    Standard of Review

A denial of ERISA benefits is reviewed under a de novo standard "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  "Where the benefit plan gives the administrator such discretionary authority, a court should review the plan administrator's decision only for abuse of  discretion." McIntyre v. Reliance Std. Life Ins. Co., 972 F.3d 955, 959 (8th Cir. 2020) (cleaned up).  As LP admits, "Blue Cross had full discretionary authority to administer and pay benefits under the plan." (Am. Compl. ¶ 9.)

The Court applies an abuse of discretion review.  The Plan gives Blue Cross full discretionary authority to administer and pay benefits under the Plan. As the Eighth Circuit recently held, even a serious procedural irregularity or a conflict of interest will not alter an abuse of discretion standard to a de novo standard.  McIntyre, 972 F.3d at 963.  Rather, if a procedural irregularity or conflict exists, the Court is required "to apply an abuse of discretion analysis, simply taking into consideration the . . . procedural irregularity." Id. (cleaned up).  Additionally, LP has failed to point to any significant procedural irregularities on remand.  Blue Cross's previous violation of the Parity Act was

not a procedural irregularity but, rather, a substantive legal decision, which was

not repeated on remand.  The delays that occurred during remand were caused

by both parties.  And Blue Cross did not commit a procedural irregularity by

violating the Court's express instruction to not raise medical necessity; rather,

Blue Cross explicitly stated that it did not consider medical necessity in reaching

its outcome but mentioned the issue to preserve it for appellate review.

Nor does the law of the case require a de novo standard of review.  Rather,

previously, the Court merely noted that no deference is owed to Blue Cross in

statutory interpretation of the Parity Act but acknowledged that the abuse of

discretion standard "plainly" applies to review of Blue Cross's interpretation of

the Plan or determination of eligibility for benefits.  (R&R at 9.)  Additionally, the

main issue that Blue Cross cited to deny LP's claim on remand was not new: the

fact that non-incidental, uncovered, recreational therapy was included in the

bundled charge was the reason that the Court remanded the matter to Blue Cross

in the first place.  Moreover, Blue Cross extensively addressed this issue during

the remand proceedings.  Cf. Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1328

(8th Cir. 1995) ("[W]here an ERISA plan gives a plan administrator . . . discretion

to decide certain issues, the fact that the administrator . . . fails to address or

decide those issues does not exempt those issues from de novo review by the district court on summary judgment.").  And while Blue Cross's official position on remand was that it could not render a decision on the amount of benefits owed because LP refused to provide the necessary information, Blue Cross clearly informed LP what information it needed and, when she refused to supply it, Blue Cross did provide, in the alternative, an attempt to calculate benefits with the information available to it.

### B.    Bundled Code

The Court holds that Blue Cross did not abuse its discretion in refusing to process the Code 1001 bundled claims for the full amount billed.  The Court specifically remanded the claims so that the uncovered services, such as education, could be removed from the claims.  (See R&R at 20.)  LP does not dispute that the Plan excludes educational services and recreational therapy. And she does not dispute that a significant portion of Change Academy's daily rate includes excluded educational services.

Requesting reimbursement for the entire daily rate under bundled code 1001 fails to follow the Court's Order and violates the Plan by requiring Blue Cross to pay for substantial non-covered services including the cost of a private high school education.  The fact that Code 1001 is used by other psychiatric in-

patient facilities or by skilled nursing facilities is irrelevant because LP has no

evidence to dispute Blue Cross's evidence that those facilities do not include

more than incidental uncovered services, such as educational expenses and

recreational therapy, in their bundled rate.  (See, e.g., ARR1352; ARR1476;

ARR1503–04; ARR1578.)  Additionally, the fact that Blue Cross pays a bundled

rate to participating providers with whom it has negotiated a contract rate is

irrelevant, because, here, Blue Cross has not negotiated with Change Academy to

agree on a bundled price that reflects a negotiated price for covered services.

Blue Cross further notes that it requires both non-participating skilled

nursing facilities and non-participating residential behavioral health treatment

facilities to exclude non-covered services from all-inclusive billing charges.

(ARR1476.)  Blue Cross permits both skilled nursing facilities and residential

behavioral health treatment facilities to bill treatment services separately from

room and board.  (ARR1425, 1476.)  For participating providers, Blue Cross's

contracts state that all payments "shall be minus . . . non-covered Health

Services" (ARR01578 at Art. V ¶ A), and Blue Cross protects against improperly

bunded charges through rate negotiations (ARR1864; 1820).

Finally, there was substantial evidence in the record to support Blue

Cross's decision that Blue Cross will only pay for "incurred" expenses (AR31-32,

190, 251-52) and that Change Academy billed Blue Cross for more than what JP

incurred because JP was billed under a self-pay discount (see, e.g., ARR1305,

Vandevoort Decl. ¶ 10).  And Blue Cross only pays for services received.  (See,

e.g., AR15, 32.)  Here, LP did not receive services at Change Academy on more

than 33 days for which Blue Cross was billed.  Based on the sworn declaration of

Change Academy, for 33 of those days, she was at home. (ARR1467, Fults Decl. ¶

14.)  And there were additional days that she was staying off-campus with her

parents.  (ARR1629–30, JP Dep. 28-29; ARR1772–73, MK Dep. 19-20; ARR1860–

61.)

### C.   Subtraction of Non-covered Services

The Court holds that Blue Cross did not abuse its discretion in rejecting the

subtraction method of calculation offered by LP (deducting 19% for educational

services from the total bundled cost) because LP admittedly did not even attempt

to subtract out uncovered recreational therapy.  The Court specifically remanded

the claims so that the uncovered services could be removed from the claims, and

despite Blue Cross's repeated requests for information regarding an estimate of

the cost of recreational therapy, LP refused to provide any estimate to remove recreational therapy services.

The Plan requires LP to submit proof that her claim is covered and payable. (AR32, 188, 253.) An ERISA "plan may place the burden of proving eligibility on the beneficiary." <u>Johnston v. Prudential Ins. Co. of Am.</u>, 916 F.3d 712, 715 (8th Cir. 2019). However, LP did not submit information sufficient to subtract the costs of canine and adventure therapy from Change Academy's all-inclusive charge. (<u>See, e.g.</u>, ARR1868.)

Change Academy's treatment plan included both canine therapy and adventure therapy. In a credentialing letter, Change Academy explains that it provides 46 hours of "therapy" per week. (ARR1243–44.) Of those 46 hours, 12 are spent in "canine therapy," and 5 are spent in "adventure therapy." (ARR1243–44; ARR1505.) Blue Cross determined that both canine and adventure therapy are nonincidental, excluded "recreational therapy" under the Plan. The Plan defines "recreational therapy" as the "prescribed use of recreational or other activities as treatment interventions to improve the functional living competence of persons with physical, mental, emotional and/or social disadvantages." (AR77, 220.)

The evidence in the record on remand amply supports Blue Cross's interpretation that the canine and adventure therapy provided were "recreational therapy" and were a significant portion of LP's therapy hours per week. Blue Cross did not violate the Parity Act by indicating that it would not ever cover canine therapy. Rather, it relied on specific evidence in the record that the particular "canine therapy" provided to LP was recreational therapy and not animal assisted therapy in the form of formal, structured sessions used to assist patients reach specific treatment goals. (See, e.g., ARR1822, 1194 (providing that, in July 2016, LP's goal was to "Review the Canine Therapy Handbook with a member of t[he] Canine Therapy Department" and that goal remained the same through February 2017); ARR1142 (providing April 2017 goal of "commit[ting] to demonstrate understanding of and faithfulness to, the canine foster/adoption process" with goal remaining the same until LP was discharged); ARR1114, 1120, 1126 (therapy notes stating LP working on grooming and foster/adoption process); ARR1101, 1108 (noting that in September and October 2017, LP was no longer interested in the canine fostering program).) Similarly, the "adventure therapy" provided by Change Academy included fly fishing, ropes courses, and cross-training workouts that Change Academy, itself, labeled

as "recreational therapy." (See, e.g., ARR1098, 1105, 1862.) Neither canine

therapy nor adventure therapy included structured sessions or specific treatment

goals. Under the deferential standard of review, there was substantial evidence

in the record to support Blue Cross's conclusion that the claims included

significant, non-covered recreational therapy.

### D.     Addition of Covered Services

Blue Cross did not abuse its discretion in refusing to adopt LP's third

alternative calculation based on assigning outpatient codes to each individual

service and adding them up. Both LP and Blue Cross agree that this method is

incorrect. (See, e.g., ARR1466, Fults Decl. ¶ 8; ("According to the AMA CPT

Professional Coding Guidebook, it is not proper to bill for a facilities charge

(such as room and board) along with outpatient codes."). See also, e.g.,

ARR1504, 1865) Additionally, this proposed method is unmoored from the $409

per day charge that JP actually paid Change Academy – the costs actually

"incurred." Therefore, Blue Cross did not abuse its discretion in refusing to

adopt this method.

### E.     Final Calculation of Benefits

The Court holds that, although Blue Cross did not abuse its discretion in

rejecting each of the three methods of calculating benefits offered by LP, Blue

Cross did abuse its discretion by refusing to pay **any** portion of LP's claim.  On remand, Blue Cross did not dispute that LP received at least some covered services from Change Academy.[1]  At a minimum, LP received the covered services of room and board and certain therapy.  "A plan administrator abuses its discretion when it ignores relevant evidence."  Willcox v. Liberty Life Assurance, 552 F.3d 693, 701 (8th Cir. 2009).

Because LP and Change Academy refused to provide an estimate of recreational therapy services to be subtracted from the $409 self-pay daily rate paid by JP, Blue Cross performed its own estimation based on the evidence in the record of the hours spent on recreational therapy.  ERISA permits Blue Cross to place the burden of proving eligibility on the beneficiary, and LP failed to show that the bundled charge minus educational expenses were eligible because she refused to remove recreational therapy services from the bundled charge. Because LP provides no alternative analysis, it was not an abuse of discretion for Blue Cross to estimate that recreational therapy accounted for 36.95% of therapy charges, and, thus, 19.03% of the total bundled charges.  LP agreed to the general

---

[1] Blue Cross has attempted to preserve its assertion that there was a lack of medical necessity for all treatment for appeal, but that was not the basis for its decision during the remand proceedings.

method of calculation of using the bundled Code 1001 charge of $409 per day and subtracting substantial non-covered services such as education as the method of calculating the correct billed charge.  The starting point for the bundled charge should be $409 per day because that is the amount that JP was charged and paid.  For a non-par provider, JP is only entitled to reimbursement of expenses actually incurred, not a windfall based on a false higher rate that the provider only submits to insurers.

Subtracting out the cost of education, which is $79.59, and the cost of recreational therapy based on Blue Cross's best estimate, which is $77.83 per day, the remaining covered charges actually paid by JP to Change Academy for days LP actually received services is $251.58 per day for no more than 430 days or $108,179.40.  (ARR1506-07, 1509-10.)

Blue Cross did not abuse its discretion by applying the 30% figure for non-par providers.  LP points to no evidence to contradict Blue Cross's evidence that it uses the 30% reimbursement rate for non-par providers under LP's Plan. The fact that Blue Cross of Missouri initially reimbursed Change Academy at a higher percentage is not helpful because it is undisputed that those bills 1) were based on a fictitious daily rate charged to Blue Cross that was not moored to the

actual daily rate paid by JP; 2) included a substantial amount of uncovered educational and recreational services; and 3) included charges for days that LP was not present at Change Academy and did not receive services.  Change Academy purported to offer a chart as evidence of reimbursement by Blue Cross for its bundled charges, but when asked by Blue Cross, LP and Change Academy failed to provide information on whether those figures were for Blue Cross plans that also excluded coverage for education and recreational services and other pertinent information.

Applying the 30% reimbursement rate and deducting the $425.66 for the amount owed in deductibles and coinsurance, Blue Cross reasonably estimated benefits owed to be $32,028.16.  (ARR1507, 1510.)  This amount is less than the $83,554.55 Blue Cross previously paid JP in error on the Change Academy claims.

**F.      Request for an Injunction**

The Court denies LP's request for an injunction.

LP asserts that an injunction is needed to prevent future harm based on the possible effect of Blue Cross's continued use of the same definition of residential behavioral health treatment facilities in the 2021 Summary Plan Description issued to JP's employer.  (JP Decl., Ex. A, 2021 Blue Cross Summary Plan

Description at 83-84 ("A Residential Behavioral Health Treatment Facility does not, other than incidentally, provide educational or recreational Services as part of its Treatment program.").)  She requests that the Court enter an injunction prohibiting Blue Cross from enforcing this language and order it removed from all subsequent Blue Cross Summary Plan Descriptions.

> LP cannot meet the legal criteria for injunctive relief.
>
> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (citations omitted).

LP bases her argument that an injunction is needed to prevent future harm on the possible effect of Blue Cross's definition of residential behavioral health treatment facilities in JP's 2021 Plan on other Plan participants.  However, she has not moved for and the Court has not granted a motion for class certification.  Therefore, the cases upon which LP relies, such as Wit v. United Behavioral Health, No. 14-CV-02346-JCS, 2020 WL 6479273, at *41 (N.D. Cal. Nov. 3, 2020) ,

in which a class had been certified, or <u>Whelan v. Colgan</u>, 602 F.2d 1060, 1061 (2d

Cir. 1979), in which the plaintiff union represented all striking workers, for the

proposition that the possibility that other insureds may be denied healthcare can

establish a threat of irreparable harm, are not applicable here where only LP's

individual claim is at issue.  LP offers no argument or evidence that LP, who is

now an adult, might ever again need or seek treatment at a residential behavioral

health treatment facility that provides nonincidental high school educational

services.

>    **G.    Request for Attorneys' Fees and Prejudgment Interest**

ERISA allows for an award of attorney fees to a prevailing participant or

beneficiary; however, an award is not mandatory.  29 U.S.C. § 1132(g)(1).  "The

party seeking fees and costs must show some degree of success on the merits but

need not be a prevailing party."  <u>Johnson Trustee of Operating Engineers Loc.</u>

<u>#49 Health & Welfare Fund v. Charps Welding & Fabricating, Inc.</u>, 950 F.3d 510,

525 (8th Cir. 2020) (citation omitted).

>    In awarding attorney's fees, courts consider five non-exclusive
>    factors, which are general guidelines, not mechanically applied.
>    These factors are: (1) the degree of the opposing parties' culpability
>    or bad faith; (2) the opposing parties' ability to satisfy an award; (3)
>    deterrence of others in similar circumstances; (4) whether the
>    requesting parties sought to benefit all participants and beneficiaries

of an ERISA plan, or to resolve a significant legal ERISA question;
and (5) the relative merits of the parties' positions.

Id. (citations omitted).

LP's request for attorneys' fees and prejudgment interest was premature.
The degree of success that LP obtained and the amount of fees to which she may
be entitled could not be addressed by the parties until the conclusion of the case.
Nor could the parties argue whether prejudgment interest is justified or calculate
that interest until the final award was decided.  Thus, LP should seek attorneys'
fees after entry of judgment.  Fed. R. Civ. P. 54(d)(2)(B).  And, because Blue Cross
owes LP no additional benefits beyond what it has already paid, prejudgment
interest is inappropriate.

### H.   Blue Cross's Counterclaim

Blue Cross has asserted a counterclaim against JP asserting that "Blue
Cross is entitled to receive from J.P., on behalf of the Plan, the amounts of
overpayments made to J.P., in an amount to be proven at trial, plus interest and
attorney's fees pursuant to 29 U.S.C. § 1132(g)."  (Am. Counter. ¶ 11.)  As a
remedy, Blue Cross seeks the following:

> With respect to Blue Cross's Counterclaim, that the Court declare
> that Blue Cross is entitled to reimbursement from J.P. for an amount
> to be proved at trial, and such other relief as permitted by ERISA as

39

interpreted in <u>Montanile v. Bd. of Trs. of the Nat'l Elevator Indus.
Health Ben. Plan</u>, 136 S. Ct. 651 (2016).

(<u>Id.</u> at 12.)

During the original proceedings, the Court found that Blue Cross's

counterclaim to recoup any overpayment to LP was not ripe for consideration

until the remand had determined the amount of LP's benefits.  (R&R at 22.)  The

Court noted that one possible outcome of the remand could be that Blue Cross

would have no overpayment to recover because it approved all of the disputed

claims.  (<u>Id.</u>)

In <u>Montanile</u>, the Supreme Court held that "an ERISA fiduciary can[not]

enforce an equitable lien against a defendant's general assets."  577 U.S. 136, 141

(2016).  The Eighth Circuit has held that a plan can bring a declaratory judgment

claim that is not barred by <u>Montanile</u>, but only when the plan does not seek a

declaration "to recover money damages" from the defendant's "general assets,"

and instead seeks guidance on how the plan should fulfill its fiduciary duties by

determining the extent of its liability.  <u>Dakotas & W. Minn. Elec. Indus. Health &

Welfare Fund by Stainbrook & Christian v. First Agency, Inc.</u>, 865 F.3d 1098, 1102

(8th Cir. 2017).  Thus, to the extent that Blue Cross pursues a declaratory

40

judgment claim to declare that it is entitled to money from JP to reimburse it for

money that it overpaid to him, its claim fails.

To the extent that Blue Cross seeks a declaration that the Plan allows Blue

Cross to offset money that a subscriber owes to Blue Cross on one claim against

money that Blue Cross owes the subscriber on another claim (AR21; AR236;

ARR1507), its claim is valid under <u>Montanile</u>.  <u>See, e.g.</u>, <u>Omega Hosp., LLC v.</u>

<u>United HealthCare Servs., Inc.</u>, No. CV 16-560-JWD-EWD, 2020 WL 7049857, at

*37 (M.D. La. Dec. 1, 2020).  However, this is the exact question at issue in the

companion case of <u>J.P. v. BCBSM, Inc.</u>, Civil File 18-3472 (MJD/DTS), in which

the Court denied class certification in January 2021.  In <u>J.P.</u>, Blue Cross has

asserted a counterclaim explicitly seeking a declaration that "Blue Cross is

entitled to set-off payments made in error and overpayments to J.P."  ([Docket

No. 50] Counterclaim at 14.)  Because Blue Cross clearly articulated its

counterclaim in <u>J.P.</u> to seek a declaration regarding its ability to offset under the

Plan and did not specifically mention offset in this lawsuit, the Court interprets

the counterclaim in this lawsuit to only seek a <u>Montanile</u>-barred claim that Blue

Cross is entitled to collect the money owed it from JP's general assets.  Thus, the

Court grants summary judgment against Blue Cross on the counterclaim, while noting that the parties can address the legality of offset in the companion case.

## IV.    REQUEST TO FILE MOTION FOR RECONSIDERATION

Blue Cross has filed a letter request for permission to file a motion for reconsideration of the Court's Order adopting the Report and Recommendation and holding that the Plan's language violated the Parity Act by defining a residential behavioral health treatment facility as a facility that "does not, other than incidentally, provide educational or recreational services as part of its treatment program." (AR110, 268.) A similar clause does not appear in the definition of skilled nursing facilities. (AR111, 269.) Originally, the Court held that the different language denies coverage for all services provided at residential behavioral health treatment facilities that provide more than incidental educational or recreational services despite providing at least some coverage for services provided at skilled nursing facilities that do so and, thus, violates the Parity Act. (R&R at 15-18.) The Court concluded that Blue Cross refuses to pay for any services at a residential behavioral health treatment facility that offers more than incidental educational services while it would pay for at least some services at a skilled nursing facility. (Id. at 16.) The Court reasoned that the residential behavioral health treatment facilities definition was an

additional restriction on facilities, not services, because otherwise the Plan's

separate exclusions for educational services and recreational therapy would be

superfluous.  (Id. at 17.)  Blue Cross provided evidence that it did pay for

professional services at Change Academy, but the Court found they were

outpatient claims and, thus, not relevant to a dispute about inpatient benefits.

(Id. at 18.)

Blue Cross asserts that, on a motion to reconsider, it would present

evidence that if a residential behavioral health treatment facility provides non-

incidental, non-covered services but separately bills them, Blue Cross does pay

the covered services.  (ARR1820.)  Blue Cross concludes that its interpretation

does not render the exclusions superfluous because the exclusions' effectiveness

depends on how facilities submit claims; if the facility provides more than non-

incidental non-covered services and bills under a bundled all-inclusive Code

1001, Blue Cross denies the claim.  During remand, LP presented evidence that

facilities generally submit their claims under a single all-inclusive code.

(ARR1298, Anderson Decl. ¶ 3.)  Blue Cross notes that, if they do so and yet lump

non-covered services into their charges, Blue Cross lacks the information to

apply the exclusions.  (ARR1820.)  And, during remand, LP submitted evidence

confirming that the professional services Blue Cross paid at Change Academy were in fact inpatient services properly billed using an outpatient code. (ARR1466, Fults Decl. ¶ 6; ARR1476, Blue Cross Document ¶ 6.)

Blue Cross asserts that the remand showed how the skilled nursing facility definition achieves the same outcome with different language.  Blue Cross requires skilled nursing facilities to be Medicare-approved (AR111, 269), which means that they accept Medicare pricing for Medicare patients (ARR1481). Because Medicare payments are capped, skilled nursing facilities have an incentive to limit their non-covered services.  (Id.)  And because skilled nursing facilities do not treat Medicare patients differently than other patients, Blue Cross expects that skilled nursing facilities would not bill commercial health plans for more than incidental non-covered services.  (Id.)

The Court denies the request to file a motion for reconsideration because Blue Cross could have offered this evidence more than a year ago before remand. Plaintiff did not clearly articulate her theory in her Amended Complaint. However, in objecting to the Report and Recommendation, Blue Cross had the opportunity to raise the argument regarding Medicare approval of skilled nursing facilities and Blue Cross's policy to pay unbundled, covered claims from

residential behavioral health treatment facilities that provide non-incidental

education or recreation therapy.  Because no class was certified, only LP's

individual claim is at issue, and LP would be highly prejudiced if Blue Cross

were permitted to belatedly introduce new evidence, which was always available

to Blue Cross, to change the rules after she spent time and expense in the remand

process.

Accordingly, based upon the files, records, and proceedings herein**, IT IS**

**HEREBY ORDERED**:

1. Plaintiff's Motion for Judicial Review Following Remand,
   Entry of Judgment, and Attorney's Fees [Docket No. 94] is
   **GRANTED IN PART** and **DENIED IN PART** as follows:
   Plaintiff is entitled to $32,028.16 in benefits for the Change
   Academy claims, which is less than the $83,554.55 Defendant
   previously paid on those claims; therefore, judgment is
   entered against Defendant for $0.  Defendant's counterclaim is
   denied.

2. Defendant's Letter Request for Permission to File Motion for
   Reconsideration [Docket No. 106] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   September 21, 2021              s/Michael J. Davis
                                        Michael J. Davis
                                        United States District Court